U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 2 2 2005

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| ELLIS TAYLOR, JR. | CIVIL ACTION NO.: 04-2227 |
|---|---|
| VERSUS | JUDGE LITTLE |
| COMM. OF SOCIAL SECURITY | MAGISTRATE JUDGE KIRK |

## REPORT AND RECOMMENDATION

This case comes before the Court for a review of the final decision of the Commissioner of Social Security ("Commissioner"), denying Ellis Taylor, Jr. ("Taylor"), Supplemental Security Income ("SSI") benefits under the Social Security Act ("SSA"). The issue to be decided is whether substantial evidence in the record supports the finding of the Administrative Law Judge ("ALJ") that Taylor is not disabled and thus not entitled to supplemental security income benefits.

Taylor was born in 1953 (Tr. 57), completed ninth grade (Tr. 75), and has past work experience as a farm laborer (Tr. 14, 70). He protectively filed an application for SSI on July 2, 2002, alleging a disability onset date of October 4, 1993, due to depression, heart problems, diabetes mellitus, high blood pressure, stomach problems, and prostate problems. (Tr. 14.) Taylor's claim was denied initially, and a request for hearing was timely made. A hearing was held on February 4, 2004 (Tr. 177-211), at which Taylor, who was represented by counsel, appeared and testified. Also testifying at the hearing was Taylor's wife, Janet Taylor, as well as Wendy Klamm, a vocational expert ("VE"). (Tr. 197-211.) The ALJ issued a decision unfavorable to the claimant on May 25, 2004, and Taylor filed a request for review with the Appeals Council. The Appeals Council denied review, and the decision of the ALJ became the final decision of the Commissioner.

Taylor had previously filed an application for disability benefits on October 4, 1993, alleging

an onset date of March 1, 1989. A partially favorable decision was rendered, finding Taylor disabled, with an onset date of October 4, 1993 rather than 1989. (Tr. 24-28.) Taylor received benefits until 2002 or 2003, at which time he received a "substantial inheritance" from his deceased father. (Tr. 173, 181-83.) After exhausting his inheritance, Taylor sought to regain his SSI benefits through the instant SSI application.

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, a claimant must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. A claimant must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of

the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### Issues

Taylor raises the following issues for review:

(1) Whether the ALJ erred in finding that Taylor did not meet or medically equal any of the listed impairments;

(2) Whether the ALJ failed to give controlling weight to the opinion of Taylor's treating physician;

(3) Whether the ALJ misinterpreted the testimony of the consultative examiner; and

(4) Whether the ALJ erred by failing to request the presence of a medical examiner.

### Factual Background

Taylor was born in 1953 and completed the ninth grade. (Tr. 57, 75.) He performed manual labor on a farm from 1975 until 1987. (Tr. 70, 204-205.) Taylor has a long history of mental

3

problems, and, in 1996, an ALJ determined that Taylor met Listing 12.04 - Major Depression with Psychosis. (Tr. 25.) Taylor received benefits until 2002 or 2003, at which time he received a "substantial inheritance" from his deceased father. (Tr. 173, 181-183.) Taylor claims that there was no change in his medical condition.

In March 2002, Taylor reported to the emergency room at LSU Health Sciences Center ("LSUHSC") complaining of right arm pain and tingling. (Tr. 119.) He had fallen from some steps approximately one week before. The doctor diagnosed a cervical sprain and noted degenerative joint disease. (Tr. 119.) Later that month, Taylor returned to LSUHSC to obtain refills of blood pressure medication. He also complained of continued arm and shoulder pain. (Tr. 117.) He was diagnosed with poorly controlled hypertension, depression, and degenerative joint disease with right shoulder pain. (Tr. 118.) He was prescribed Nifedipine for blood pressure, Zoloft for depression, and advised to continue taking his current medications of Vioxx, Doxazosin, and Ultram. (Tr. 118.)

In April 2002, Taylor reported an improved mood after taking Zoloft. (Tr. 115.) Taylor was diagnosed with atypical chest pain and hypertension in May 2002, after x-rays and ultrasounds were normal. (Tr. 112.) He reported that he was taking Vioxx, Ultram, Doxazosin, Wellbutrin, and Prozac, and he was prescribed hydrochlorothiazide. (Tr. 112.)

Dr. A.R. Ebrahim evaluated Taylor on August 20, 2002. (Tr. 125-127.) Taylor complained of depression, back pain, pedal edema, hypertension, and diabetes mellitus. (Tr. 125.) Dr. Ebrahim noted that Taylor appeared very depressed with severe loss of affect. Taylor had been depressed all of his life and has been treated at the LSU mental health clinic. (Tr. 125.) He was taking Axid 150 mg, Phenazopydne 100 mg, Zoloft 100 mg, Protonix 40 mg, Doxazosin 8 mg, HCTZ 25 mg, Monopril 10 mg, and Zyprexa 10 mg. (Tr. 125.) Taylor had poor concentration. He was 6'2" and

weighed 333 lbs. (Tr. 126.) Dr. Ebrahim noted that Taylor "certainly suffers from depression," had degenerative changes of the lumbar spine, and was of poor concentration, with a loss of affect and drowsy. (Tr. 127.)

Catherine Hansen, Ph.D., a licensed psychologist, performed a mental status examination of Taylor on August 16, 2002, at the request of Disability Determination Services ("DDS"). (Tr. 121.) Dr. Hansen noted that Taylor was guarded and non-responsive. He exhibited no spontaneity and extremely poor eye contact. Because Taylor was not engaged in the evaluation, Dr. Hansen noted that her evaluation was questionably valid or reliable. (Tr. 121.) The psychologist noted that Taylor had been treated at the mental health center since the late 1980s or early 1990s and has been hospitalized on several occasions. In 2001, he was incarcerated and hospitalized because of discharging a gun, allegedly at "little green men." (Tr. 121-122.) He attempted suicide by overdose of medication in 2000. (Tr. 122.) Dr. Hansen noted that Taylor was not hostile and cooperated until he developed a headache. (Tr. 122.) He exhibited extremely poor social skills. He exhibited hallucinations and paranoia for many years, as well as depression. (Tr. 122.) Dr. Hansen's diagnosis was schizophrenia, paranoid type, with prominent negative symptoms and major depressive disorder, recurrent, moderate, as well as obesity, hypertension, GERD, diabetes (provisional) and osteoarthritis (provisional). (Tr. 123.)

Sandra Durdin, Ph.D., a licensed clinical psychologist, performed a psychological evaluation of Taylor on October 17, 2002, also at the request of DDS. (Tr. 132-134.) Dr. Durdin noted that Taylor was well-groomed, and spoke in intelligible and logical sentences. (Tr. 132.) His mood was subdued, but he was responsive. The psychologist stated that there were numerous examples of malingering. (Tr. 132.) Dr. Durdin found that Taylor intentionally refused to cooperate with the

examination. Taylor discussed some prior hallucinations that he had regarding hearing voices in the woods and people coming out of the floors. He reported that he was being treated by Dr. Wheat at Natchitoches Mental Health. (Tr. 133.) He reported taking Sertraline[1] and Zyprexa,[2] but claimed to have hallucinations nonetheless. (Tr. 133.) Dr. Durdin noted that Taylor continued to interrupt her in order to convince her that he was seeing things. He would not cooperate with testing. Dr. Durdin opined that Taylor was malingering.

Patrick Wheat, M.D., a psychiatrist, evaluated Taylor on August 9, 2002. Dr. Wheat noted that Taylor had previously treated at the Natchitoches Mental Health Clinic from 1994 through 1999 for Major Depression and Schizoaffective Disorder, but that he got off of his medications. (Tr. 150.) In June 2002, Taylor was placed on Zoloft, but Dr. Wheat noted that, from previous experience, Taylor did not respond adequately until Zyprexa was started in 1997. (Tr. 150.) Dr. Wheat found Taylor cooperative with poor eye contact, and noted moderate motor slowing, tearful affect, and depressed mood. (Tr. 151.) Taylor denied suicidal ideation and hallucinations. (Tr. 151.) Dr. Wheat diagnosed Schizoaffective Disorder, depressed type, and assessed a Global Assessment Functioning ("GAF") score of 40[3], which denotes major impairments in several areas such as work

---

[1]Sertraline is an SSRI used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.

[2]Zyprexa (Olanzapine) is used to treat psychotic mental disorders, such as schizophrenia, bipolar disorder, and agitation that occurs with schizophrenia and bipolar mania.

[3]The Global Assessment of Functioning, or GAF, score represents Axis V of the multiaxial assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical

6

or school, family relations, judgment, thinking, or mood. Dr. Wheat prescribed Zoloft 100 mg and Zyprexa 10 mg. (Tr. 152.) He instructed Taylor to follow up in one year. Taylor returned to Dr. Wheat on August 7, 2003. (Tr. 157.) The diagnosis was unchanged, except a GAF score of 45 was noted. (Tr. 157.) Dr. Wheat prescribed Olanzapine, Sertraline, and Bupropion. (Tr. 159.)

In 2004, Dr. Wheat completed a mental residual functional capacity assessment wherein he noted that moderate limitations in the areas of ability to understand, remember, and carry out very short and simple instructions, the ability to interact appropriately with the public, and the ability to ask simple questions or request assistance. (Tr. 164-65.) Dr. Wheat noted marked limitations in numerous areas, including understanding, memory, concentration, persistence, social interaction, and adaptation. (Tr. 165.) Dr. Wheat found that Taylor's ability to understand was impaired due to the long history of depression, paranoia, and living in isolation. (Tr. 166.) His ability to concentrate on gainful work tasks and to interact with others is "grossly impaired," as is his ability to function socially and to adapt to different and new settings. (Tr. 166.) Dr. Wheat opined that Taylor did not have the functional capacity to perform a full time job. (Tr. 170.)

Issues No. 1 and 2: <u>Whether the ALJ erred in finding that Taylor did not meet or medically equal any of the listed impairments, and whether the ALJ failed to give controlling weight to the opinion of Taylor's treating physician</u>

The ALJ found that Taylor suffered from depression and hypertension, impairments that were severe within the meaning of the regulations, but not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. (Tr. 16.) The ALJ evaluated

---

continuum of mental health-illness. A GAF score of 31-40 indicates some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. <u>DSM-IV-TR</u>, at 34; <u>Boyd v. Apfel</u>, 239 F.3d 698 (5th Cir. 2001).

Taylor's depression under Listing 12.04, which provides as follows:

> 12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> 1. The required level of severity for these disorders is met when the requirements in *both* A and B are satisfied, *or* when the requirements in C are satisfied.
>
>> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>>
>> 1. Depressive syndrome characterized by at least four of the following: (a) Anhedonia or pervasive loss of interest in almost all activities; (b) Appetite disturbance with change in weight; (c) Sleep disturbance; (d) Psychomotor agitation or retardation; (e) Decreased energy; (f) Feelings of guilt or worthlessness; (g) Difficulty concentrating or thinking; (h) Thoughts of suicide; (i) Hallucinations, delusions, or paranoid thinking; or
>>
>> 2. Manic syndrome characterized by at least three of the following: (a) Hyperactivity; (b) Pressure of speech; (c) Flight of ideas; (d) Inflated self-esteem; (e) Decreased need for sleep; (f) Easy distractability; (g) Involvement in activities that have a high probability of painful consequences which are not recognized; (h) Hallucinations, delusions or paranoid thinking; or
>>
>> 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
>>
>> AND
>>
>> B. Resulting in at least two of the following:
>>
>> 1. Marked restriction of activities of daily living; or
>>
>> 2. Marked difficulties in maintaining social functioning; or
>>
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>> 4. Repeated episodes of decompensation, each of extended duration;
>>
>> OR
>>
>> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ determined that Taylor did not meet the listing because he failed to satisfy 12.04(B) or 12.04 (C). The ALJ determined that Taylor's mental impairment resulted in a *mild* restriction of his activities of daily living, *moderate* difficulties in maintaining social functioning, *moderate* difficulties in maintaining concentration, persistence, or pace, and *no* repeated episodes of decompensation, each of extended duration. (Tr. 16.) However, Dr. Wheat found that Taylor's interest in recreational and daily activities was "grossly impaired," that his social functioning has been "grossly impaired for years," and that Taylor's impairments have "grossly affected" his concentration, memory, persistence and pace. (Tr. 169.) Further, Dr. Wheat found marked limitations in numerous areas, including the areas of ability to remember locations and work-like procedure, ability to understand, remember, and carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities with a schedule, sustain ordinary routine, and work without being distracted by others, ability to make simple work-related decisions, ability to complete a normal workday and workweek without interruption from psychologically based symptoms, ability to accept instructions, to maintain socially appropriate behavior, to respond appropriately to changes in the work setting, and to be aware of normal hazards and take precautions, and the ability to travel in unfamiliar places and to set realistic goals. (Tr. 164-165.) Further, the record indicates that, in 1996, an ALJ determined that Taylor met Listing 12.04

based on the treatment notes of Dr. Wheat and Dr. Bienvenu. (Tr. 25-28.)

A claimant has the burden of proving his condition meets or medically equals an impairment listed in Appendix 1. See Sullivan v. Zebley, 493 U.S. 521 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify." Id. (emphasis added). Here, Taylor points out that, as Dr. Wheat opined, Taylor has "gross" and "marked" limitations in three of the four criteria set forth in 12.04 B. Therefore, had Dr. Wheat's opinion been given controlling weight, it would have been determined that Taylor met Listing 12.04.[4]

The Commissioner argues that Dr. Wheat's opinion was not entitled to controlling weight because it was contrary to the record as a whole, and because it addressed an issue reserved to the Commissioner. Dr. Wheat did not issue an opinion as to whether Taylor's impairments met or equaled a listing. Rather, he submitted treatment notes, completed a Mental Residual Functional Capacity Assessment form, and a mental status questionnaire, commenting on Taylor's limitations based on his illnesses. In Myers v. Apfel, 238 F.3d at 621, the Fifth Circuit stated hat it has long held that the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability. However, the opinion of the treating physician is not conclusive and the ALJ must decide the claimant's status. Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the treating physician's testimony. The good cause exceptions recognized by the Fifth Circuit include disregarding statements that are brief, conclusory,

---

[4]In her decision, the ALJ does not state that Taylor failed to meet the criteria in Listing 12.04 A. She only discusses a failure to meet Listing 12.04 B or C. The record clearly supports a finding that Taylor meets 12.04 A(1).

10

not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. An ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. Myers, 238 F.3d at 621, citing Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).

Taylor treated with Dr. Wheat for approximately eight years. (Tr. 150.) Dr. Wheat provided detailed, not conclusory, notes regarding Taylor's condition, which he diagnosed as Schizoaffective Disorder, Depressed Type. As stated above, Dr. Wheat found Taylor to have marked limitations in numerous areas, specifically noting "gross limitations" in the areas of daily living and social functioning. (Tr. 169-170.) Dr. Wheat's current findings are consistent with those relied on by the ALJ in 1996, where the ALJ noted that Taylor had marked limitations in the areas of daily living and social functioning, frequent problems with concentration, persistence, and pace, and repeated episodes of deterioration or decompensation. (Tr. 33.) Dr. Wheat's findings are also consistent with those of Dr. Hansen, who performed an evaluation at the request of DDS. Dr. Hansen diagnosed schizophrenia, paranoid type, with prominent negative symptoms and major depressive disorder, recurrent, moderate, as well as obesity, hypertension, GERD, diabetes (provisional) and osteoarthritis (provisional). (Tr. 123.) Dr. Hansen also detailed Taylor's mental health treatment history from the late 1980s or early 1990, as well as being hospitalized on many occasions. (Tr. 121.) Dr. Durdin performed another exam for DDS, resulting in no diagnosis being issued because she found Taylor hostile and uncooperative. Despite Dr. Durdin's lack of diagnosis, the substantial evidence of record clearly supports Dr. Wheat's diagnosis and findings.

11

The ALJ discounted Dr. Wheat's opinion, finding that it was contrary to his progress notes, which reflected that the claimant was "stable" and "coping" in 2003. The ALJ therefore gave Dr. Hansen's and Dr. Durdin's opinions controlling weight.[5] However, the progress notes referenced by the ALJ are those of the social worker with home Taylor met on July 9 and November 10, 2003, and January 7, 2004. (Tr. 158.) The social worker noted that, during the sessions, Taylor's affect was "stable," "pleasant," and "coping." (Tr. 158.) Those notes do not contradict Dr. Wheat's diagnoses and opinions. The Court finds that Dr. Wheat's opinion is not contrary to his progress notes or the substantial evidence in the record. Dr. Wheat's opinion should have been accorded controlling weight. Based on Dr. Wheat's opinion, as well as the other medical records in evidence, it is clear that Taylor meets or medically equals Listing 12.04. Furthermore, the undersigned notes that Taylor's severe mental illness has lasted substantially longer than the twelve-month durational requirement for disability, as discussed in Singletary v. Bowen, 798 F.2d 818, 822 (5th Cir. 1986).

Issue No. 3:    Whether the ALJ misinterpreted the testimony of the consultative examiner

Taylor argues that the ALJ misinterpreted the testimony of the consultative examiner, Dr. Hansen. The ALJ gave Dr. Hansen's opinion controlling weight stating, "Dr. Hansen believed there were signs of malingering but cannot evaluate because his responses were so vague." (Tr. 15.) Dr. Hansen actually reported that screening for malingering was not possible because Taylor's responses were vague. (Tr. 123.) Still, Dr. Hansen issued a diagnoses that is consistent with that of Taylor's treating physician, Dr. Wheat. The ALJ addressed Dr. Hansen's and Dr. Durdin's opinions as if they were the same. However, as noted above, Dr. Hansen's report actually supports the other evidence of record finding that Taylor exhibited no spontaneity and had extremely poor eye contact, that

---

[5] However, as noted above, Dr. Hansen's diagnosis is consistent with Dr. Wheat's.

12

Taylor had been treated at the mental health center since the late 1980s or early 1990s and has been hospitalized on several occasions, that he suffered from hallucinations, paranoia, and depression, and that Taylor was not hostile and cooperated until he developed a headache. (Tr. 122.)

Issue No. 4: Whether the ALJ erred by failing to request the presence of a medical examiner

Finally, Taylor argues that the commissioner erred by failing to request the presence of a medical examiner at the administrative hearing. The ultimate decision whether to solicit the assistance of a medical expert is solely within the discretion of the ALJ. See Richardson v. Perales, 402 U.S. 389 (1998). Nonetheless, Taylor submits that an expert was necessary in this matter since the medical and testimonial evidence of record clearly indicate that Listing 12.04 had been met or medically equaled. While a medical expert certainly would have been helpful in this instance, it was not necessary, as the record as whole indicates that Taylor meets Listing 12.04.

I find that the record lacks substantial evidence to support the Commissioner's decision that Taylor does not meet Listing 12.04.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the decision of the Commissioner be REVERSED and VACATED and that Taylor be awarded benefits from the protective filing date of July 2, 2002. IT IS FURTHER RECOMMENDED that the case be REMANDED to the Commissioner for a calculation of Taylor's benefits from that date.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten**

**(10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ___ day of July, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE